A-S-P ASSOCIATES v. CITY OF RALEIGH

No. 103

(Filed 3 October 1979)

1. **Constitutional Law § 13.1; Municipal Corporations § 29.4— creation of historic preservation district—valid exercise of police power**

An ordinance of the City of Raleigh creating the Oakwood Historic District constituted a valid exercise of the police power since (1) the police power encompasses the right to control the exterior appearance of private property when the object of such control is the preservation of the State's legacy of historically significant structures and (2) the architectural and design standards set forth in the ordinance provide the only feasible manner in which the historic aspects of an entire district can be maintained.

2. **Municipal Corporations § 30.10— creation of historic preservation district—application of standards to new construction**

An ordinance of the City of Raleigh creating the Oakwood Historic District is not invalid when applied to new construction in the historic district, since the preservation of the historic aspects of a district requires more than simply the preservation of those buildings of historical and architectural significance within the district.

3. **Constitutional Law § 8.2; Municipal Corporations § 30.1— historic preservation district—"incongruity" standard for use by historic district commission—no delegation of legislative authority**

Provisions of G.S. 160A-397 and of the Raleigh ordinance creating the Oakwood Historic District which give to the Raleigh Historic District Commission the authority to prevent certain specified activities which would be "incongruous" with the historic aspects of the District do not constitute an impermissible delegation of the legislative power to the Commission since the conditions and characteristics of the Oakwood Historic District's physical environ-

ment are sufficiently distinctive and identifiable to provide reasonable guidance to the Commission in applying the "incongruity" standard. *A fortiori*, architectural guidelines and design standards provided by the ordinance for use by the Commission in its administration of the Oakwood Historic District ordinance do not constitute an impermissible delegation of legislative power.

**4. Municipal Corporations § 30.9— creation of historic preservation district—no spot zoning**

A city ordinance creating a historic preservation district did not constitute "spot zoning" because it failed to include certain property owned by the N. C. Medical Society while including property owned by plaintiff and others in the same block, since the ordinance created a 102 acre overlay zoning district and did not reclassify a relatively small tract owned by a single person surrounded by a much larger area.

**5. Municipal Corporations § 30.10— creation of historic preservation district—no denial of equal protection**

A city ordinance creating a historic preservation district did not deny equal protection of the laws to plaintiff by including property owned by plaintiff and certain others in the historic district while excluding property on the same block owned by the N. C. Medical Society, since a reasonable basis existed for the exclusion of the Medical Society's property and the inclusion of other similarly located property where the evidence tended to show: the Medical Society's building is a large, four story modern structure; its architectural style is extremely incongruous with the historic aspects of the district; the Medical Society made substantial investments in the foundations of the building in order that two additional stories can be added in the future; adjacent lots owned by the Medical Society, which were also excluded from the historic district, were acquired to provide additional parking necessary to future expansion of the building; plaintiff's property, when purchased in 1972, had on it a dilapidated structure which was subsequently demolished, and the property has since remained vacant; and other pieces of property in the same block are either vacant or have structures on them which are reasonably compatible in scale, orientation, setback and architectural style with the historic aspects of the district.

**6. Municipal Corporations § 30.9— comprehensive zoning plan—creation of historic preservation district**

The superior court did not err in its conclusion that the City of Raleigh has a comprehensive plan for zoning purposes and that an ordinance creating the Oakwood Historic District was enacted in accordance with it as required by G.S. 160A-383.

**7. Municipal Corporations § 30.5— uniformity in zoning regulations—overlay historic preservation district**

The requirement of G.S. 160A-382 that zoning regulations "shall be uniform for each class or kind of building throughout each district" does not prohibit the creation of an overlay historic district which imposes additional regulations on some property within an underlying use-district and not on all of the property within it, since this does not destroy the uniformity of the regulations applicable to the underlying use-district.

**8. Municipal Corporations § 30.5— creation of historic preservation district—most appropriate use of land requirement**

In enacting an ordinance creating the Oakwood Historic District, the City of Raleigh did not violate the requirement of G.S. 160A-383 that zoning regulations "be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city."

Justice CARLTON took no part in the consideration or decision of this case.

ON defendant's petition for discretionary review of the decision of the Court of Appeals, 38 N.C. App. 271, 247 S.E. 2d 800 (1978), reversing summary judgment entered by *Braswell, J.,* on 30 June 1977, in Superior Court, WAKE County. This case was argued as No. 31 at the Spring Term 1979.

Plaintiff brought this action seeking a declaratory judgment the two ordinances adopted on 3 June 1975 by the City of Raleigh are invalid both on constitutional and statutory grounds. The two ordinances (hereinafter referred to collectively as the Oakwood Ordinance) amended the City's zoning ordinance to create a 98 acre, overlay historic district in the City's Oakwood neighborhood (hereinafter referred to as the Historic District), established the Raleigh Historic District Commission (hereinafter referred to as the Historic District Commission), adopted architectural guidelines and design standards to be applied by the Historic District Commission in its administration of the Oakwood Ordinance, and provided civil and criminal penalties for failure to comply with the Oakwood Ordinance. *See Code of the City of Raleigh,* §§ 24-57 through 57.8 (1959).

The Ordinance was adopted pursuant to G.S. §§ 160A-395 through 399, which authorize municipalities to designate historic districts and to require that after the designation of a historic district any property owner within it who desires to erect, alter, restore, or move the exterior portion of any building or other structure first obtain a certificate of appropriateness from a historic district commission.[1] A historic district commission's action is limited by G.S. § 160A-397 to "preventing the construc-

---

1. The constitutionality of historic district preservation is a matter of first impression for this Court. Governmental regulation of private property in the interest of historic district preservation is by no means a novelty within this State, however. In 1948 the City of Winston-Salem passed a comprehensive zoning ordinance, which included the creation of an Old Salem Historic Preservation District. The ordinance created a Board of Architectural Review and required issuance of a certificate of appropriateness prior to alteration of

tion, reconstruction, alteration, restoration, or moving of buildings, structures, appurtenant fixtures, or outdoor advertising signs in the historic district which would be incongruous with the historic aspects of the district."

In May of 1974, the Division of Archives and History of the North Carolina Department of Cultural Resources nominated Raleigh's Oakwood neighborhood for inclusion on the United States Department of Interior's National Register of Historic Places. In the required statement of significance, the Division's Survey and Planning Unit observed:

> "Oakwood, a twenty-block area representing the only in-tact nineteenth century neighborhood remaining in Raleigh, is composed predominantly of Victorian houses built between the Civil War and 1914. Its depressed economic state during most of the twentieth century preserved the neighborhood until 1971, when individuals began its revitalization. The great variety of Victorian architectural styles represented by the houses reflects the primarily middle-class tastes of the business and political leaders of Raleigh for whom they were built, as well as the skill of local architects and builders. Oakwood is a valuable physical document of Southern subur-ban life during the last quarter of the nineteenth century."

On 25 June 1974, the Oakwood neighborhood was placed on the National Register.

At the request of The Society for the Preservation of Historic Oakwood, the Planning Department of the City of Raleigh conducted a study of the Oakwood neighborhood in 1974. Those conducting the study found that a high rate of absentee ownership existed in the neighborhood, that banks were reticent to lend money in the Oakwood area as a result of its unstable property values, that significant private efforts to preserve the historic aspects of the neighborhood had been undertaken, and that the neighborhood was at a transition point with an uncertain future. The recommendation of the study was that the City take affirmative action in one of two ways: (1) Plan and zone the

the exterior architectural features of any structure within the district. It was not until 1965, however, that the General Assembly passed a special enabling act authorizing the cities of Winston-Salem, Halifax, and Edenton to create historic districts. N. C. Session Laws, Ch. 504 (1965). *See Note, Land Use Controls in Historic Areas,* 44 Notre Dame Law. 379, 397-401 (1969).

neighborhood for high density residential and commercial development, which would result in the loss of most aspects of the historic significance of the neighborhood, or (2) maintain the neighborhood as medium density residential with an emphasis on preserving its historic aspects.

In January of 1975, the Planning Department submitted to the City Council *A Proposal for the Designation of Oakwood as an Historic District.* A proposed ordinance was submitted to the State Division of Archives and History for review, and recommended changes were made. On 10 April 1975, a joint public hearing was held before the Raleigh City Council and Planning Commission at which both proponents and opponents of the ordinance presented their views. On 3 June 1975 the City Council adopted the Oakwood Ordinance.

The Historic District thus created is an overlay zoning district. All zoning regulations in the area in effect prior to passage of the Oakwood Ordinance remain in effect. Compliance with the Oakwood Ordinance is required in addition to compliance with the pre-existing, underlying zoning regulations. Most of the area covered by the Historic District is zoned residential. A relatively small portion of the area covered by it is zoned as office and institutional. Associates own a vacant lot, located within the Historic District at 210 North Person Street. The lot is within the office and institutional zoning district.

On 22 July 1975 Associates brought this action challenging the validity of the Ordinance on constitutional and statutory grounds. A. C. Hall, Jr., Director of Planning for the City of Raleigh, and Linda Harris, an employee of the City Planning Department, who did extensive work on the drafting of the Ordinance, were subsequently deposed by Associates. Associates also submitted to the defendant City a lengthy set of interrogatories. On 19 January 1977, Associates filed a motion for summary judgment. Defendant City submitted, without objection by Associates, a substantial amount of documentary evidence in response to the motion. On 30 June 1977, the superior court entered an order denying Associates' motion for summary judgment and granting summary judgment in favor of defendant City on all claims raised by the complaint. The Court of Appeals reversed the case on several grounds and remanded it. On 5

January 1979, we allowed defendant's motion for discretionary review of the decision of the Court of Appeals.

*Allen, Steed & Allen, by Arch T. Allen III, and Noah H. Huff-stetler III, for plaintiff.*

*Thomas A. McCormick, City Attorney, by Ira J. Botvinick, Associate City Attorney, for defendant.*

BROCK, Justice.

Associates' appeal to the Court of Appeals assigned error to the grant of summary judgment in favor of defendant City. Summary judgment may, when appropriate, be rendered against the party moving for such judgment. *Blades v. City of Raleigh*, 280 N.C. 531, 187 S.E. 2d 35 (1972); *Bland v. Bland*, 21 N.C. App. 192, 203 S.E. 2d 639 (1974). Summary judgment in favor of the non-movant is appropriate when the evidence presented demonstrates that no material issues of fact are in dispute, and the non-movant is entitled to entry of judgment as a matter of law.

Associates argue in their brief that their motion for summary judgment was limited to their claims of constitutional invalidity of the Oakwood Ordinance. They argue that it was, therefore, error for the superior court to grant summary judgment in favor of defendant City on all claims raised in Associates' complaint.

It is apparent from the record, however, that both plaintiff and defendant were afforded adequate opportunity to and did submit evidentiary materials on all aspects of the case. The evidentiary materials submitted show, furthermore, that both Associates' constitutional and their statutory challenges to the validity of the Oakwood Ordinance raise only questions of law. Summary judgment for the non-moving party should be granted only when the moving party has been given adequate opportunity to show in opposition that there is a genuine issue of fact to be resolved. 10 Wright & Miller, *Federal Practice and Procedure*, § 2720, p. 471 (1973). Associates were afforded that opportunity in this instance and the entry of summary judgment in favor of defendant City on all claims was proper.

The Court of Appeals found that material issues of fact existed with respect to two claims in Associates' complaint.

Associates' contention that substantial questions of fact existed with respect to other claims was not considered. Because we reverse the decision of the Court of Appeals on the two issues considered determinative by it, we must consider all issues raised.

Associates' first contentions are that the Oakwood Ordinance deprives them of their property without due process of law in contravention of the Fourteenth Amendment to the United States Constitution, and that it deprives them of their property otherwise than by the law of the land in contravention of Article I, Section 19, of the North Carolina Constitution. The terms "law of the land" and "due process of law" are synonymous. *Horton v. Gulledge,* 277 N.C. 353, 177 S.E. 2d 885 (1970); *State v. Ballance,* 229 N.C. 764, 51 S.E. 2d 731 (1949).

Associates' claim is premised on a line of cases in which this Court has indicated that a statute or ordinance based purely on aesthetic considerations, without any real or substantial relation to the public health, safety or morals, or the general welfare, deprives individuals of due process of law. *State v. Vestal,* 281 N.C. 517, 189 S.E. 2d 152 (1972); *Little Pep Delmonico Restaurant, Inc. v. Charlotte,* 252 N.C. 324, 113 S.E. 2d 422 (1960); *State v. Brown,* 250 N.C. 54, 108 S.E. 2d 74 (1959); *In Re O'Neal,* 243 N.C. 714, 92 S.E. 2d 189 (1956); *State v. Staples,* 157 N.C. 637, 73 S.E. 112 (1911); *Barger v. Smith,* 156 N.C. 323, 72 S.E. 376 (1911); *State v. Whitlock,* 149 N.C. 542 (1908). Associates contend that the Oakwood Ordinance falls within the scope of such impermissible exercise of the police power because it focuses entirely on the exterior appearance of structures within the Historic District. Associates further contend that even if the Ordinance is a valid exercise of the police power insofar as it is applied to historic structures, it is invalid when applied to new construction on property such as Associates' vacant lot.

The police power is inherent in the sovereignty of the State. *Winston-Salem v. Southern R.R. Co.,* 248 N.C. 637, 105 S.E. 2d 37 (1958). It is as extensive as may be required for the protection of the public health, safety, morals and general welfare. *State v. Hales,* 256 N.C. 27, 122 S.E. 2d 768 (1961); *State v. Warren,* 252 N.C. 690, 114 S.E. 2d 660 (1960). The police power may be delegated by the State to its municipalities whenever deemed

necessary by the Legislature. *Raleigh v. Norfolk Southern R.R. Co.*, 275 N.C. 454, 168 S.E. 2d 389 (1969).

Several principles must be borne in mind when considering a due process challenge to governmental regulation of private property on grounds that it is an invalid exercise of the police power. First, is the object of the legislation within the scope of the police power? Second, considering all the surrounding circumstances and particular facts of the case is the means by which the governmental entity has chosen to regulate reasonable? *G.I. Surplus Store v. Hunter*, 257 N.C. 206, 125 S.E. 2d 764 (1962); *State v. Brown*, 250 N.C. 54, 108 S.E. 2d 74 (1959); *Winston-Salem v. Southern R.R. Co.*, 248 N.C. 637, 105 S.E. 2d 37 (1958). This second inquiry is two-pronged: (1) Is the statute in its application reasonably necessary to promote the accomplishment of a public good and (2) is the interference with the owner's right to use his property as he deems appropriate reasonable in degree?

Moreover, in reviewing acts of the Legislature this Court must not lose sight of the fact that "[s]ince the police power of the State has not been, and by its nature cannot be, placed within fixed definitive limits, it may be extended or restricted to meet changing conditions, economic as well as social." *Winston-Salem v. Southern R.R. Co.*, *supra*, at 642-43, 105 S.E. 2d at 41. Also, "[w]hen the most that can be said against [an ordinance] is that whether it was an unreasonable, arbitrary or unequal exercise of power is fairly debatable, the courts will not interfere. In such circumstances the settled rule seems to be that the court will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining whether its action is in the interest of the public health, safety, morals, or general welfare." *In Re Appeal of Parker*, 214 N.C. 51, 197 S.E. 706 (1938). *Euclid v. Ambler Realty*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

Legislative exercise of the police power to regulate private property in the interest of historic preservation has met with increasing acceptance by the courts of other jurisdictions. *E.g., Maher v. City of New Orleans*, 516 F. 2d 1051 (5th Cir. 1975); *Bohannan v. City of San Diego*, 30 Cal. App. 3d 416, 106 Cal. Rptr. 333 (1973); *Figarsky v. Historic District Comm.*, 171 Conn. 198, 368 A. 2d 163 (1976); *Rebman v. City of Springfield*, 111 Ill. App. 2d 430, 250 N.E. 2d 282 (1969); *City of New Orleans v. Levy*, 223

La. 14, 64 So. 2d 798 (1953); *Opinion of the Justices,* 333 Mass. 773, 128 N.E. 2d 557 (1955); *Opinion of the Justices,* 333 Mass. 783, 128 N.E. 2d 563 (1955); and *City of Santa Fe v. Gamble-Skogmo, Inc.,* 73 N.M. 410, 389 P. 2d 13 (1964). *See Comment, Historic Preservation Cases: A Collection,* 12 Wake Forest L. Rev. 227 (1976). Historic district legislation similar to the provisions of G.S. §§ 160A-395 through 399 has now been enacted by at least thirty-nine states. Beckwith, *Developments in the Law of Historic Preservation and a Reflection on Liberty,* 12 Wake Forest L. Rev. 93, 95 n. 18 (1976); Wilson and Winkler, *The Response of State Legislation to Historic Preservation,* 36 Law and Contemp. Prob., 329 (1971). More than 500 cities and towns have passed local landmark or historic district ordinances. National Trust for Historic Preservation, *Historic Preservation and the Law,* Part IV, ch. 5, p. 3 (1978).

In *Maher v. City of New Orleans, supra,* plaintiff challenged an ordinance that regulates the preservation and maintenance of buildings in the historic Vieux Carre section of that City. In rejecting plaintiff's contention that the architectural controls imposed by the ordinance were not within the parameters of police power regulation, the Court observed: "[p]roper state purposes may encompass not only the goal of abating undesirable conditions, but of fostering ends the community deems worthy . . . . Nor need the values advanced be solely economic or directed at health and safety in their narrowest senses. The police power inhering in the lawmaker is more generous, comprehending more subtle and ephemeral societal interests." *Id.* at 1060.

The United States Supreme Court has also recognized the expansive scope of the states' police power. In *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954) it was observed, albeit in the context of an exercise of power of eminent domain, that "the concept of the public welfare is broad and inclusive. (Citation omitted.) The values it represents are spiritual as well as physical, aesthetic as well as monetary." In the recent case of *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed. 2d 631 (1978), applying the concept of the public welfare found in *Berman,* the Court upheld comprehensive governmental regulation of private property designed to preserve historic buildings in the City of New York.

[1] In *State v. Vestal,* 281 N.C. 517, 189 S.E. 2d 152 (1972), we took note of the growing body of authority in other jurisdictions recognizing that the police power may be broad enough to include reasonable regulation of property for aesthetic reasons alone. Although we are not now prepared to endorse such a broad concept of the scope of the police power, we find no difficulty in holding that the police power encompasses the right to control the exterior appearance of private property when the object of such control is the perservation of the State's legacy of historically significant structures. "While most aesthetic ordinances are concerned with good taste and beauty . . . a historic district zoning ordinance . . . is not primarily concerned with whether the subject of regulation is beautiful or tasteful, but rather with preserving it as it is, representative of what it was, for such educational, cultural, or economic values as it may have. Cases dealing with purely aesthetic regulations are distinguishable from those dealing with preservation of a historical area or a historical style of architecture." *A. Rathkopf, The Law of Zoning and Planning,* § 15.01, p. 15-4, (4th ed. 1975).

The preservation of historically significant residential and commercial districts protects and promotes the general welfare in distinct yet intricately related ways. It provides a visual, educational medium by which an understanding of our country's historic and cultural heritage may be imparted to present and future generations. That understanding provides in turn a unique and valuable perspective on the social, cultural, and economic mores of past generations of Americans, which remain operative to varying degrees today. *N. Williams, American Planning Law, Land Use and the Police Power,* § 71A.02, p. 88 (Cum. Supp. 1978). Historic preservation moreover serves as a stimulus to protection and promotion of the general welfare in related, more tangible respects. It can stimulate revitalization of deteroriating residential and commercial districts in urban areas, thus contributing to their economic and social stability. *Figarsky v. Historic District Comm.,* 171 Conn. 198, 208, 368 A. 2d 163, 167 (1976); R. Montague & T. Wrenn, *Planning for Preservation,* pp. 11-17 (America's Society of Planning Officials 1969). It tends to foster architectural creativity by preserving physical examples of outstanding architectural techniques of the past. *N. Williams, supra,* at § 71A.02. It also has the potential, documented in

numerous instances, *e.g.*, in the Vieux Carre section of New Orleans, of generating substantial tourism revenues. *City of New Orleans v. Levy*, 223 La. 14, 64 So. 2d 798 (1953); R. Montague & T. Wrenn, *supra;* Schroder, *The Preservation of Historical Areas*, 62 Ky. L. J. 940 (1974). Although it is also recognized that historic preservation legislation, particularly historic district ordinances, may adversely affect the welfare of certain segments of society and infringe on individual liberty, Beckwith, *Developments in the Law of Historic Preservation and A Reflection on Liberty*, 12 Wake Forest L. Rev. 93 (1976); Newsom, *Blacks, and Historic Preservation*, 36 Law & Contemp. Probs. 423 (1971), the wisdom of such legislation is "fairly debatable," precluding substitution of our judgment for that of the General Assembly.

[1,2]  Although the object of particular legislation may well be within the scope of the police power, the legislation may yet deprive individuals of due process of law if the means chosen to implement the legislative objective are unreasonable. *Euclid v. Ambler Realty, supra; Maher v. City of New Orleans, supra.* Such is not the case here, however. Comprehensive regulation of the "construction, reconstruction, alteration, restoration, or moving of buildings, structures, appurtenant fixtures, or outdoor advertising signs in the historic district which would be incongruous with the historic aspects of the district" is the only feasible manner in which the historic aspects of an entire district can be maintained. Associates' contention that the provisions in the Oakwood Ordinance requiring issuance of a certificate of appropriateness for *new construction* is unreasonable, particularly when applied to Associates' plans to construct an office building on its now vacant lot, is without merit. It is widely recognized that preservation of the historic aspects of a district requires more than simply the preservation of those buildings of historical and architectural significance within the district. In rejecting a similar challenge, the District Court in *Maher v. City of New Orleans*, 371 F. Supp. 653, 663 (E.D. La. 1974) observed: "just as important is the preservation and protection of the setting or scene in which [structures of architectural and historical significance] are situated." *See City of New Orleans v. Permagent, supra;* Wiedl, *Historic District Ordinances*, 8 Conn. L. Rev. 209, 215-17 (1976). This "tout ensemble" doctrine, as it is now often termed, is an integral and reasonable part of effective historic district preservation.

Most important, however, is the fact that Associates and other property owners similarly situated are not prohibited by the Oakwood Ordinance from erecting new structures. They are only required to construct them in a manner that will not result in a structure incongruous with the historic aspects of the Historic District. Property owners within the Historic District may, by virtue of this requirement, be unable to develop their property for its most profitable use or at the cost they would prefer. But the mere fact that an ordinance results in the depreciation of the value of an individual's property or restricts to a certain degree the right to develop it as he deems appropriate is not sufficient reason to render the ordinance invalid. *Zopfi v. City of Wilmington*, 273 N.C. 430, 160 S.E. 2d 325 (1968); *Helms v. Charlotte*, 255 N.C. 647, 122 S.E. 2d 817 (1961). The test of reasonableness necessarily involves a balancing of the diminution in value of an individual's property and the corresponding gain to the public. Sax, *Takings and the Police Power*, 74 Yale L. J. 36 (1964).

[3]   Associates next contend that the superior court erred as a matter of law in ruling that the Oakwood Ordinance does not delegate legislative power to the Historic District Commission. Legislative power is vested exclusively in the General Assembly by Article II, Section 1, of the North Carolina Constitution. From this provision and from Article I, Section 6, derives the principle that the General Assembly may not delegate its power to any other department or body. *Motsinger v. Perryman*, 218 N.C. 15, 9 S.E. 2d 511 (1940); *Coastal Highway v. Turnpike Authority*, 237 N.C. 52, 74 S.E. 2d 310 (1953). This principle, however, is not absolute.

> "Since legislation must often be adapted to complex conditions involving numerous details with which the Legislature cannot deal directly, the constitutional inhibition against delegating legislative authority does not deny to the Legislature the necessary flexability of enabling it to lay down policies and establish standards, while leaving to designated governmental agencies and administrative boards the determination of facts to which the policy as declared by the Legislature shall apply. (Citation omitted.) Without this power, the Legislature would often be placed in the awkward situation of possessing a power over a given subject without being able to exercise it." *Coastal Highway v. Turnpike Authority, supra*, at 60, 74 S.E. 2d at 316.

Associates contend that adequate standards have not been established in this instance.

Analysis of the statutes authorizing the establishment of historic districts by cities and counties and the Oakwood Ordinance itself is necessary to resolution of this issue. G.S. § 160A-395 authorizes any municipal governing body to designate one or more historic districts as a part of its general zoning ordinance. Municipal governing bodies (which term includes governing boards of counties as well) are thereby delegated the legislative power to determine whether or not to designate a historic district or districts. This delegation of power is not challenged by Associates. Delegation to municipal corporations of the States' police power to legislate concerning local problems such as zoning is permissible by long standing exception to the general rule of non-delegation of legislative power. *In Re Markham*, 259 N.C. 566, 131 S.E. 2d 329 (1963); *Jackson v. Board of Adjustment*, 275 N.C. 155, 166 S.E. 2d 78 (1969).

The delegation of legislative power to municipal governing bodies is not in this instance, however, an unlimited delegation. G.S. § 160A-396 provides that before a city or county may designate one or more historic districts it must establish a historic district commission.[2] G.S. § 160A-396 further limits the delegation of power by specifying that, "a majority of the members of such a commission shall have demonstrated special interest, experience, or education in history or architecture . . . ." G.S. § 160A-397 imposes another limitation by specifying the method by which a historic district ordinance adopted by a city or county is to be enforced:

> "From and after the designation of a historic district, no exterior portion of any building or other structure (including stone walls, fences, light fixtures, steps and pavement, or other appurtenant features) nor above-ground utility structure nor any type of outdoor advertising sign shall be erected, altered, restored, or moved within such district until after an application for a certificate of appropriateness as to exterior architectural features has been submitted to and approved by the historic district commission."

2. G.S. § 160A-396 provides as an alternative that, "[i]n lieu of establishing a separate historic district commission, a municipality may designate as its historic district commission, either (i) the municipal historic properties commission, established pursuant to G.S. § 160A-399.2, or (ii) the municipal planning board. In order for the planning board to be designated, at least two of its members shall have demonstrated special interest, experience, or education in history or architecture."

G.S. § 160A-397 then establishes the standard by which a historic district commission is to be bound in its administration of a historic district by approving or disapproving applications for Certificates of Appropriateness:

> "The commission shall not consider interior arrangement and shall take no action under this section except for the purpose of preventing the construction, reconstruction, alteration, restoration, or moving of buildings, structures, appurtenant fixtures, or outdoor advertising signs in the historic district *which would be incongruous with the historic aspects of the district.*" (Emphasis added.)

The statutory authorization of historic district ordinances is, therefore, a mixture of delegated legislative and administrative power. A municipal governing body has unlimited discretion to determine whether or not to establish a historic district or districts. Once it chooses to do so, however, its discretion insofar as the method and the standard by which a historic district ordinance is to be administered is, by contrast, extremely limited. A historic district ordinance is to be administered by a historic district commission, the composition of which is specified by the General Assembly, in accordance with the standard of "incongruity" set directly by the General Assembly in G.S. § 160A-397.

The Oakwood Ordinance itself reflects this statutory mixture of delegated legislative and administrative powers. The Ordinance first establishes the Historic District and its boundaries. Section 24-57.4 of the Code of the City of Raleigh establishes the Raleigh Historic District Commission to enforce the Ordinance;[3] Section 24-57.1 authorizes the Historic District Commission to require applications for a Certificate of Appropriateness for any proposed activities within the Historic District which are covered by the specific provisions of G.S. § 160A-397, quoted *supra;* Section 24-57.3 adopts the standard set forth in G.S. § 160A-397 of preventing those activities specified in G.S. § 160A-397 "which would be incongruous with the historic aspects of the district" as the limitation on the discretion conferred on the Historic District Commission.

Section 24-57.3 further provides that an appeal may be taken to Raleigh's Board of Adjustment from the Historic District Com-

---

3. The City of Raleigh apparently followed the alternative procedure provided for by G.S. § 160A-396, set forth in note 2, *supra*, of designating the Raleigh Historic Properties Commission as the City's Historic District Commission as Section 24-57.4 of the Ordinance indicates that the membership of the two commissions is to be the same.

mission's decision on an application for a Certificate of Appropriateness. Appeal to the Superior Court of Wake County from a decision of the Board of Adjustment is also provided for.

Section 24-57.5 incorporates by reference "architectural guidelines and design standards," which are set forth in a January 1975 report prepared by Raleigh's Planning Department entitled *A Proposal for the Designation of Oakwood as an Historic District.*[4] The Historic District Commission is directed to apply the incorporated guidelines and standards in its consideration of applications for Certificates of Appropriateness.

. It is on these "architectural guidelines and design standards" that Associates mistakenly focus their contention that power to administer the Oakwood Ordinance has been delegated to the Historic District Commission without adequate standards. Associates contend the architectural guidelines and design standards "vest the Commission with the untrammeled authority to compel individual property owners in the Historic District to comply with whatever arbitrary or subjective views the members of the Commission might have as to how property in the district should be maintained or developed."

From the foregoing analysis of the enabling statutes and the Oakwood Ordinance itself, however, it is manifestly clear that it is not the guidelines and standards incorporated into the Oakwood Ordinance which must meet the legal test of sufficiency, but rather it is the standard set forth in G.S. § 160A-397 and in the Ordinance itself, which limits the discretion of the Historic District Commission to preventing only those of certain specified activities, "which would be incongruous with the historic aspects of the district." Although we cannot ignore in our consideration the guidelines and standards incorporated into the Oakwood Ordinance, if the general standard of "incongruity" is legally sufficient to withstand a delegation challenge, the incorporated

---

4. There are three major divisions to the architectural guidelines and design standards; those which apply to proposed changes to existing structures; those which apply to new construction; and those which apply to landscaping. Those which apply to existing structures of the Victorian style are further subdivided into nine categories, each of which focuses on a different structural element, *e.g.*, materials, colors, and fenestration patterns. A description of the different Victorian styles as they relate to a particular structural element is given. Specific and general prohibitions of designs, materials and styles that are incongruous with the existing elements of particular Victorian styles are also set forth. Similar, although less developed consideration is given to the other architectural styles of historical interest found in the Historic District.

Those guidelines which apply to new construction are similarly subdivided with cross-references to the structural element categories of existing structures. In addition, this section of the guidelines sets forth limitations on such things as spacing, lot coverage, and height, which are flexibly related to the same characteristics of existing structures in proximity to a proposed new structure. Consideration is also given to characteristics such as spacing, orientation, scale, and proportions of new structures in a third part of this section.

guidelines and standards, which give varying degrees of specificity to that general standard, are sufficient *a fortiori.*

In the recent case of *Adams v. Dept. of N.E.R.*, 295 N.C. 683, 249 S.E. 2d 402 (1978) we observed with respect to the delegation of power to an administrative agency:

> "When there is an obvious need for expertise in the achievement of legislative goals the General Assembly is not required to lay down a detailed agenda covering every conceivable problem which might arise in the implementation of the legislation. It is enough if general policies and standards have been articulated which are sufficient to provide direction to an administrative body possessing the expertise to adapt the legislative goals to varying circumstances." *Id.* at 698, 249 S.E. 2d 411.

We also joined in *Adams* a growing trend of authority by recognizing that "the presence or absence of procedural safeguards is relevant to the broader question of whether a delegation of authority is accompanied by adequate guiding standards." *Id.*

The general policy and standard of "incongruity," adopted by both the General Assembly and the Raleigh City Council, in this instance is best denominated as "a contextual standard." A contextual standard is one which derives its meaning from the objectively determinable, interrelated conditions and characteristics of the subject to which the standard is to be applied. *See* Turnbull, *Aesthetic Zoning*, 7 Wake Forest L. Rev. 230, 242 (1971). In this instance the standard of "incongruity" must derive its meaning, if any, from the total physical environment of the Historic District. That is to say, the conditions and characteristics of the Historic District's physical environment must be sufficiently distinctive and identifiable to provide reasonable guidance to the Historic District Commission in applying the "incongruity" standard.

Although the neighborhood encompassed by the Historic District is to a considerable extent an architectural melange, that heterogeneity of architectural style is not such as to render the standard of "incongruity" meaningless. The predominant architectural style found in the area is Victorian, the characteristics of which are readily identifiable. City of Raleigh, Planning Department, *A Proposal to Designate Oakwood as a Historic District*, p. 1 (1975); N.C. Department of Cultural Resources, *National*

*Register Nomination Form, Oakwood Historic District* (1974). In his deposition, Raleigh's Planning Director, A. C. Hall, Jr., testified:

> "[T]he remaining part of Oakwood, yes, has been developed since that time, with varying types of architectures, filling in the holes, so to speak, in the neighborhood, but still this is in my opinion and my recollection, this is the only and the best example, and has a majority of worthwhile Victorian or Victorian Era structures in it, in the neighborhood that we have."

The characteristics of other architectural styles of historical interest found in the Historic District are equally distinctive and objectively ascertainable. *A Proposal to Designate Oakwood as a Historic District, supra,* pp. 16-17. The architectural guidelines and design standards incorporated into the Oakwood Ordinance (described in note 4, *supra*) provide an analysis of the structural elements of the different styles and provide additional support for our conclusion that the contextual standard of "incongruity" is a sufficient limitation on the Historic District Commission's discretion.

It will be remembered that G.S. § 160A-396 requires that a majority of the members of a historic district commission shall have demonstrated special interest, experience, or education in history or architecture. There is no evidence that Raleigh's Historic District Commission is not so constituted. To achieve the ultimate purposes of historic district preservation, it is a practical necessity that a substantial degree of discretionary authority guided by policies and goals set by the legislature, be delegated to such an administrative body possessing the expertise to adapt the legislative policies and goals to varying, particular circumstances. *Adams v. Dept. of N.E.R., supra.* It is a matter of practical impossibility for a legislative body to deal with the host of details inherent in the complex nature of historic district preservation.

It is therefore sufficient that a general, yet meaningful, contextual standard has been set forth to limit the discretion of the Historic District Commission. Strikingly similar standards for administration of historic district ordinances have long been approved by courts of other jurisdictions. *E.g., Maher v. City of New Orleans,* 516 F. 2d 1051 (5th Cir. 1975); *South of Second Associates v. Georgetown,* (Colo.) 580 P. 2d 807 (1978); *City of*

*New Orleans v. Permagent,* 198 La. 852, 5 So. 2d 129 (1941); *Town of Deering ex rel. Bittenbender v. Tibbetts,* 105 N.H. 481, 202 A. 2d 232 (1964); *City of Santa Fe v. Gamble-Skogmo, Inc.,* 73 N.M. 410, 389 P. 2d 13 (1964); *Opinion of the Justices,* 333 Mass. 773, 128 N.E. 2d 557 (1955); *Hayes v. Smith,* 92 R.I. 173, 167 A. 2d 546 (1961).

The procedural safeguards provided will serve as an additional check on potential abuse of the Historic District Commission's discretion. *Adams v. Dept. of N.E.R., supra.* Provisions for appeal to the Board of Adjustment from an adverse decision of the Historic District Commission will afford an affected property owner the opportunity to offer expert evidence, cross-examine witnesses, inspect documents, and offer rebuttal evidence. *See Refining Co. v. Board of Aldermen,* 284 N.C. 458, 202 S.E. 2d 129 (1974). Similar protection is afforded to a property owner by the right to appeal from a decision of the Board of Adjustment to the Superior Court of Wake County.

For the reasons stated, the superior court's ruling that the Oakwood Ordinance does not impermissibly delegate legislative power to the Historic District Commission is affirmed.

[5] Associates' third contention is that the superior court erred in concluding that defendant City did not deny Associates' equal protection of the laws by including Associates' property in the Historic District while excluding property owned by the North Carolina Medical Association, which is located in the same block.

The factual basis on which this contention rests is set forth in detail at 38 N.C. App. 271, 247 S.E. 2d 802 (1978). Condensing it somewhat for purposes of brevity, the facts are as follows. Associates' vacant lot is located at 210 North Person Street. Adjacent to it at 216 North Person Street is the former Mansion Square Inn, built in the nineteenth century. The State Medical Society's large, four story office building is located at 222 North Person Street. These three pieces of property and a fourth at 204 North Person Street have been included since 1961 in an office and institutional zoning district. At the request of the State Medical Society, the property on which its building is located and two other adjacent lots owned by the Society in the same block were excluded from the overlay Historic District. Associates' request that their vacant lot be similarly excluded was denied and theirs and all other property in the same block was included in the Historic District. Associates' equal protection claim is based

on its allegations that defendant City acted arbitrarily and capriciously in setting the boundaries of the Oakwood Historic District because the included and excluded pieces of property are similarly located.

Without considering the questions raised by this contention, the Court of Appeals held that Associates had made a prima facie showing of arbitrary and capricious spot zoning. The Court of Appeals further held, relying on our holding in *D&W, Inc. v. The City of Charlotte*, 268 N.C. 577, 151 S.E. 2d 241 (1966) that a major part of defendant City's evidence offered to show a reasonable basis for exclusion of the Medical Society's property should not have been considered because "it is impermissible in this jurisdiction to prove the intent of a legislative body by statements of one of its members." 38 N.C. App. at 276, 247 S.E. 2d at 804. Disregarding defendant City's evidence, the Court of Appeals reversed the judgment of the superior court and ordered the case remanded for further proceedings on the question of whether or not defendant City had engaged in impermissible spot zoning.

[4]  Spot zoning is "[a] zoning ordinance or amendment which singles out and reclassifies a relatively small tract owned by a single person and surrounded by a much larger area, uniformly zoned, so as to impose upon the small tract greater restrictions than those imposed upon the larger area, or so as to relieve the small tract from restrictions to which the rest of the area is subjected . . . ." *Blades v. City of Raleigh*, 280 N.C. 531, 549, 187 S.E. 2d 35, 45 (1972). So defined, it is apparent that defendant City has not, in this instance, engaged in spot zoning at all. The City by passing the Oakwood Ordinance created a 102 acre overlay, zoning district (as it is authorized to do by G.S. § 160A-395), the restrictions of which apply to numerous individual property owners. In drawing the boundaries of the Historic District the City merely decided not to include certain property owned by the Medical Society, while including that owned by Associates and others in the same block. Reclassification of a relatively small tract owned by a single person surrounded by a much larger area, uniformly zoned, is simply not the issue involved. Thus we need only consider the equal protection of the laws claim raised by Associates.

The applicable rule of law by which our consideration must be guided is well stated in *Guthrie v. Taylor*, 279 N.C. 703, 185 S.E. 2d 193 (1971), *cert. denied*, 406 U.S. 920, 92 S.Ct. 1774, 32 L.Ed. 2d 119 (1972).

"Neither the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution nor the similar language in Art. I, § 19, of the Constitution of North Carolina takes from the State the power to classify persons or activities when there is reasonable basis for such classification and for the consequent difference in treatment under the law. (Citations omitted.)

The test is whether the difference in treatment made by the law has a reasonable basis in relation to the purpose and subject matter of the legislation." *Id.* at 713-14, 185 S.E. 2d at 201.

The reasonableness of a particular classification is a question of law for determination by the court. *State v. Bass*, 171 N.C. 780, 87 S.E. 972 (1916). In its consideration of a particular legislative classification, which term encompasses the setting of zoning district boundaries, a court is bound, however, by two fundamental, related limitations. 8A McQuillin, Municipal Corporations, § 25.278, p. 284 (3d ed. 1976). First, there is a presumption that a particular exercise of the police power is valid and constitutional. *Durham County v. Addison*, 262 N.C. 280, 136 S.E. 2d 600 (1964); *Kinney v. Sutton*, 230 N.C. 404, 53 S.E. 2d 306 (1949), and the burden is on the property owner to show otherwise. *Raleigh v. Morand*, 247 N.C. 363, 100 S.E. 2d 870 (1957); *State v. Baynes*, 222 N.C. 425, 23 S.E. 2d 344 (1942). Second, it must be remembered that classification is exclusively a legislative function. Because it is such, a court may not substitute its judgment of what is reasonable for that of the legislative body, particularly when the reasonableness of a particular classification is fairly debatable. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Schloss v. Jamison*, 262 N.C. 108, 136 S.E. 2d 691 (1964). This second limitation is reflected in former Chief Justice Bobbitt's observation in *State v. Greenwood*, 280 N.C. 651, 658, 187 S.E. 2d 8, 13 (1972) that: "The equal protection clauses do not require perfection in respect of classifications. In borderline cases the legislative determination is entitled to great weight."

A major part of defendant City's evidence on which it relied to show a reasonable basis for exclusion of the Medical Society's property was in the form of transcripts of proceedings of Raleigh's City Council. The City also relied upon the depositions of Linda Harris and A. C. Hall, Jr. The Court of Appeals held, as noted *supra*, that the transcripts of the council's proceedings were not competent evidence to be construed by the court in rul-

ing on the motion for summary judgment. We note that the transcripts in this instance were offered not to prove the intent of a legislative body but offered instead to prove the facts stated therein and the council's consideration of them. *See Cheatham v. Young*, 113 N.C. 161, 18 S.E. 92 (1893). The issue of their admissibility is thus distinguishable from that involved in *D&W, Inc. v. The City of Charlotte, supra*. We need not decide, however, the different question raised. That decision is obviated by the fact that no objection was made to consideration of the evidence. Indeed, counsel for Associates expressly stated at the hearing on the motion that Associates had no objection to the court considering the affidavit of Gail Smith, Raleigh's City Clerk and Treasurer, of which the transcripts were a part. Thus the long standing rule applies that "[e]vidence admitted without objection, though it should have been excluded had proper objection been made, is entitled to be considered for whatever probative value it may have," 1 *Stansbury's North Carolina Evidence*, § 27, p. 66 (Brandis Rev. 1973). *See Harriet Cotton Mills v. Textile Workers*, 251 N.C. 218, 111 S.E. 2d 457 (1959).

[5] The evidence presented at the hearing on the motion for summary judgment showed: The State Medical Society's building is a large (four story), modern structure; virtually all elements of its architectural style are, by contrast with the structures on property included in the Historic District, extremely incongruous with its historic aspects; The Medical Society made substantial investments in the foundations of the building in order that two additional stories can be added at some point in the future; the adjacent lots owned by the Society, which were also excluded from the District, were acquired to provide additional off-street parking necessary to future expansion of the building; Associates' property, when purchased in 1972 had on it a delapidated structure, which was subsequently demolished, and the property has remained vacant since; other pieces of property in the same block are either vacant or have structures on them which are reasonably compatible in terms of scale, orientation, setback and architectural style with the historic aspects of the District.

Bearing in mind the touchstone of judicial review of a particular legislative classification, the object of the legislative exercise of the police power, we cannot say that the superior court erred in its conclusion of law that a reasonable basis existed for

the exclusion of The Medical Society's property while other property in the same block was included in the Historic District. Associates' property, other property in the same block, and that owned by the Medical Society are indeed *similarly located.* They are not, however, *similarly situated,* insofar as the purposes of the Historic District Ordinance is concerned. Substantial and material differences exist, as clearly shown by the uncontroverted evidence presented, which support the superior court's conclusion of law.

Exclusion from the Historic District of only that property owned by the Medical Society on which its building is located might have been a wiser choice. But is well settled that legislative bodies may make rational distinctions with substantially less than mathematical exactitude. *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed. 2d 511 (1976).

The decision of the Court of Appeals on this aspect of the case is reversed and the judgment of the superior court is affirmed.

[6]  Associates' fourth contention is that the superior court erred in its conclusion of law that the City of Raleigh has a comprehensive plan for zoning purposes and that the Oakwood Ordinance was enacted in accordance with it as required by G.S. § 160A-383.

The Court of Appeals held that the evidence presented raised "substantial issues of material fact with regard to the existence *vel non* of a current comprehensive plan for development of the City of Raleigh and its application to the plaintiff's property." *A-S-P Associates, supra,* at 278, 247 S.E. 2d at 805. On this basis the Court of Appeals reversed the judgment of the superior court and remanded the case for further proceedings.

The holding of the Court of Appeals is apparently based upon the view that an extrinsic, written plan, such as a master plan based upon a comprehensive study, is required. This definition of the comprehensive plan required by G.S. § 160A-383 was expressly rejected by the Court of Appeals in *Allred v. City of Raleigh,* 7 N.C. App. 602, 173 S.E. 2d 533 (1970). *Allred* was reversed by this Court on other grounds at 277 N.C. 530, 178 S.E. 2d 432 (1971). We refrained there from defining the required comprehensive plan.

As noted in the opinion of the Court of Appeals in *Allred* at 7 N.C. App. 607, 173 S.E. 2d at 536, the zoning enabling legislation of more than forty states includes a comprehensive plan requirement similar to that in G.S. § 160A-383, 1 *Williams, American Land Planning Law*, § 18.05, p. 359 (1974). Absent a specific requirement in the enabling legislation, courts have generally not construed the term to require, as a condition precedent to the enactment of a zoning ordinance, the preparation and adoption of a formal master plan. *E.g., Poremba v. Springfield*, 354 Mass. 432, 238 N.E. 2d 43 (1968); *Chestnut Hill Co. v. Snohomish*, 76 Wash. 2d 741, 458 P. 2d 891, *cert. denied*, 397 U.S. 988 (1969). *See* Haar, *In Accordance with a Comprehensive Plan*, 68 Harvard L. Rev. 1154 (1955). "[T]he courts have discovered the requisite comprehensive plan in places ranging from the zoning ordinance itself to the preamble of the zoning amendment in question." 1 Anderson, *Ameircan Law of Zoning*, § 5.05, p. 268 (1976). We do not find it necessary here to attempt an all-inclusive definition of the required comprehensive plan. What suffices as such may well vary according to the stage at which a particular city or county is in its zoning process. The evidence presented at the hearing on the motion for summary judgment showed, however, that at this late stage in its zoning process, the City of Raleigh is operating pursuant to a sufficiently comprehensive plan. The City has in effect a comprehensive set of zoning regulations which cover the entire City. The City's Planning Department has conducted comprehensive studies of the City's housing, transportation, public facilities, parks and recreation, and a wide range of other needs. Moreover, the evidence showed that before the City adopted the Oakwood Ordinance, planning studies of the area proposed to be included in the Historic District were conducted, which gave careful and comprehensive consideration to the potential effect on other ways in which the City is attempting to protect and promote the general welfare through the exercise of its zoning powers. That some inconsistencies exist among the various planning efforts engaged in by the City is not indicative of the possible absence of a comprehensive plan as so held by the Court of Appeals. A rational process of planning for a large city's varied needs inherently involves conflicts, changes, and inconsistent proposals as to how they should be met.

The decision of the Court of Appeals reversing the conclusion of law of the superior court that the City of Raleigh has in effect

a comprehensive plan and that the Oakwood Ordinance was enacted pursuant to it is reversed, and the judgment of the superior court is affirmed.

Associates further contend that the superior court erred in its conclusions of law that the defendant City did not violate two other requirements of Chapter 160A, Article 19, Part 3, of the General Statutes when it enacted the Oakwood Ordinance.

[7] The first of these is G.S. § 160A-382, which requires that "[a]ll regulations shall be uniform for each class or kind of building throughout each district . . . ." It will be remembered that G.S. § 160A-395 authorizes alternative types of historic districts. A historic district may be either a separate use-district or an overlay district.

Defendant City followed the latter alternative, superimposing the Historic District on preexisting residential and office and institutional districts in which Associates' property is located. Associates contend this action by the City violates the uniformity requirement of G.S. § 160A-382, since its property is subject to the Historic District regulations while other property in the same office and institutional district is not.

G.S. § 160A-382 only requires that the regulations of a particular use-district apply uniformly throughout the district. It does not prohibit by implication the creation of overlay districts. That the creation of an overlay historic district may impose additional regulations on some property within an underlying use-district and not on all of the property within it, does not destroy the uniformity of the regulations applicable to the underlying use-district. This conclusion of law by the superior court is, therefore, affirmed.

[8] Associates' final contention is that the superior court erred when it concluded that the City complied with the requirement of G.S. § 160A-383 that zoning regulations "be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such city."

"This statute, obviously, does not contemplate that the zoning pattern must be, or should be, designed to permit each in-

dividual tract of land to be devoted to its own most profitable use, irrespective of the surrounding area." *Blades v. City of Raleigh,* 280 N.C. 531, 545, 187 S.E. 2d 35, 43 (1972). Moreover, the inclusion of Associates' property in the Historic District does not change the use to which Associates' property may be put, since it remains within an office and institutional district first created in 1961. The uncontroverted evidence amply supports the superior court's conclusion of law on this point.

The decision of the Court of Appeals is reversed, and the entry of summary judgment by the superior court in favor of defendant City on all claims raised by Associates' complaint is affirmed.

Reversed and remanded.

Justice CARLTON took no part in the consideration or decision of this case.