HART BOOK STORES, INC.; Raleigh Books, Inc.; Tri-State News, Inc.; Ronald Mothershead, d/b/a R. and M. Adult Book Store; Jesse F. Frye, Jr., d/b/a L. & J. News Stand; Larry Gene Moore, d/b/a E. & M. EnterPrises; Thomas Page, d/b/a Player's Book Store; Joseph Raymond MC Broom, d/b/a M Distributors; Camera's Eye, Inc., a North Carolina Corporation, Appellees,

v.

Rufus EDMISTEN, Attorney General of North Carolina; Randolph Riley, District Attorney for 10th Judicial District; E. Raymond Alexander, District Attorney for 18th Judicial District; Donald K. Tisdale, District Attorney for 21st Judicial District; Donald Jacobs, District Attorney for 8th Judicial District; Dan K. Edwards, District Attorney for 14th Judicial District; H. W. Zimmerman, District Attorney for 22nd Judicial District; Donald Greene, District Attorney for 25th Judicial District; James C. Roberts, District Attorney for 19th Judicial District, W. A. Allen, Sheriff, Durham County, North Carolina; T. B. Seagroves, Chief of Police, City of Durham, North Carolina; The State of North Carolina; William H. Andrews, District Attorney for 4th Judicial District; William Allen Cobb, District At-

torney for 5th Judicial District; Edward W. Grannis, Jr., District Attorney for 12th Judicial District; Wade Barber, Jr., District Attorney for 15(b) Judicial District; C. D. Knight, Sheriff, Orange County, North Carolina; Herman Stone, Chief of Police, City of Chapel Hill, North Carolina, Appellants.

U. T. INCORPORATED, a Georgia Corporation, d/b/a Camera's Eye Bookstore; and Mind's Eye, Inc., a North Carolina Corporation, d/b/a as Mind's Eye and Imperial Book Store, Appellees,

v.

Rufus EDMISTEN, Attorney General of the State of North Carolina; Joseph Brown, District Attorney of the Twenty-Seventh Judicial District and Individually; C. C. Elmore, Chief of Police of City of Gastonia and Individually; Peter Gilchrist, District Attorney for the Twenty-Sixth Judicial District and Individually; Donald Greene, District Attorney for the Twenty-Fifth Judicial District and Individually, Appellants.

Nos. 78–1461, 78–1706.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1979.

Decided Dec. 4, 1979.

Arnold Loewy, Professor of Law, University of North Carolina, Chapel Hill, N. C. (Rufus L. Edmisten, Atty. Gen., Marvin Schiller, Asst. Atty. Gen., Raleigh, N. C., on brief), for appellants.

Michael K. Curtis, Greensboro, N. C. (Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N. C., Thomas F. Loflin, III, Loflin, Loflin, Galloway, Leary & Acker, Durham, N. C., on brief), for appellees.

Before JEAN S. BREITENSTEIN, United States Circuit Judge for the Tenth Circuit, sitting by designation, and WIDENER and PHILLIPS, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

The issue on these consolidated appeals is the constitutionality of a North Carolina statute providing that a single building that contains an adult bookstore, adult theater, adult mini-theater, massage parlor, or sexual device wares cannot contain a second such "adult establishment." [1]   Two federal

---

1. N.C.Gen.Stat. § 14–202.10. Definitions.—As used in this Article:

(1) "Adult bookstore" means a bookstore having as a preponderance of its publica-

district courts determined, in separate suits brought by the proprietors of affected establishments, that the statute abridged freedoms of speech and press protected by the First and Fourteenth Amendments, the requirement of equal protection imposed by the Fourteenth Amendment, the due process proscription against vagueness, and the right of privacy guaranteed by the Constitution. On the defendant's appeals, consolidated in this court, we conclude that the Supreme Court decision in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) essentially controls decision here and requires reversal. We do so, and sustain the statute over free

speech and press, equal protection, vagueness and privacy objections.

The statute under attack prohibits the location of any one "adult establishment" in the same "building, premises, structure, or other facility" occupied by another adult establishment or sexual device vendor. N.C.Gen.Stat. § 14–202.11. "Adult establishment" is defined to include adult bookstores, adult motion picture theaters, and adult mini-theaters, having a "preponderance" of wares "distinguished or characterized by an emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas," and also to include massage businesses. *Id.*

tions, books, magazines, and other periodicals which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas, as defined in this section.

(2) "Adult establishment" means an adult bookstore, adult motion picture theater, adult mini motion picture theater, or a massage business as defined in this section.

(3) "Adult motion picture theater" means an enclosed building with a capacity of 50 or more persons used for presenting motion pictures, a preponderance of which are distinguished or characterized by an emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas, as defined in this section, for observation by patrons therein.

(4) "Adult mini motion picture theater" means an enclosed building with a capacity for less than 50 persons used for presenting motion pictures, a preponderance of which are distinguished or characterized by an emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas, as defined in this section, for observation by patrons therein.

(5) "Massage" means the manipulation of body muscle or tissue by rubbing, stroking, kneading, or tapping, by hand or mechanical device.

(6) "Massage business" means any establishment or business wherein massage is practiced, including establishments commonly known as health clubs, physical culture studios, massage studios, or massage parlors.

(7) "Sexually oriented devices" means without limitation any artificial or simulated specified anatomical area or other device or paraphernalia that is designed in whole or part for specified sexual activities.

(8) "Specified anatomical areas" means:
a. Less than completely and opaquely covered:
(i) human genitals, pubic region, (ii) buttock, or (iii) female breast below a point immediately above the top of the areola; or
b. Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(9) "Specified sexual activities" means:
a. Human genitals in a state of sexual stimulation or arousal;
b. Acts of human masturbation, sexual intercourse or sodomy; or
c. Fondling or other erotic touchings of human genitals, pubic regions, buttocks or female breasts.

§ 14–202.11. Restrictions as to adult establishments.—No building, premises, structure or other facility that contains any adult establishment shall contain any other kind of adult establishment. No building, premises, structure or other facility in which sexually oriented devices are sold, distributed, exhibited, or contained shall contain any adult establishment.

§ 14–202.12. Violations; penalties.—Any person who violates G.S. 14–202.11 shall be guilty of a misdemeanor and shall be imprisoned for a term not to exceed three months or fined an amount not to exceed three hundred dollars ($300.00), or both, in the discretion of the court. Any person who has been previously convicted of a violation of G.S. 14–202.11, upon conviction for a second or subsequent violation of G.S. 14–202.11, shall be guilty of a misdemeanor and shall be imprisoned for a term not to exceed six months or fined an amount not to exceed five hundred dollars ($500.00), or both, in the discretion of the court.

§ 14–202.10. "Specified sexual activities" and "specified anatomical areas" are defined as sexually explicit or erotic things. *Id.* Violations are made misdemeanors, punishable by fines up to $500 and imprisonment up to six months. *Id.* § 14–202.12.

Civil actions challenging the statute in the Eastern and Western Districts of North Carolina requested injunctive and declaratory relief. The proprietor-plaintiffs alleged, and the district courts below found, that the statute limited plaintiffs' ability to choose the types of material to be sold or exhibited in their stores; that in order to avoid prosecution, the plaintiffs who sold both books and films emphasizing sexual matters were obliged to acquire a preponderance of non-sexually-oriented books in order to continue the exhibition of sexually-oriented films; and that all of them abandoned the sale of sexual devices in order to comply with the statute. The plaintiffs alleged that these changes increased the cost of doing business though none went so far as to contend that they had been forced to close their establishments or that their demise was imminent as a result of their compliance with the statute.

On the basis of these findings, one district court held in consolidated actions, *Hart Book Stores, Inc. v. Edmisten*, 450 F.Supp. 904 (E.D.N.C.1978), that the North Carolina statute violates the First Amendment and the equal protection guarantee of the Fourteenth Amendment, in that it allows, without sufficient justification, a "significant intrusion" into businesses dealing in materials protected by the First Amendment. *Id.* at 906. The court further concluded that *Young v. American Mini-Theaters, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) did not apply because the North Carolina statute, unlike the ordinance upheld in *Mini-Theatres*, was not a true zoning law. 450 F.Supp. at 906–07.

In *U. T. Inc. v. Edmisten*, Nos. 77–365 and 77–366 (W.D.N.C. July 24, 1978), the other district court also found that the statute contravened freedom of speech and equal protection. Additionally, the latter court held the statute unconstitutionally vague and in violation of the right of privacy. *Id.*, slip op. at 4–5. Finally, that court also concluded that *Mini-Theatres* did not control the case before it and was not inconsistent with its ruling. *Id.* at 6.

I

Unlike the district courts, we consider that the Supreme Court decision in *Mini-Theatres*, upholding a Detroit ordinance that prohibited locating "adult" establishments within one thousand feet of each other, essentially controls decision here. Since much of our analysis parallels and draws from the *Mini-Theatres* analysis, it seems appropriate at the outset to summarize the salient factual aspects of that case, comparing them with comparable aspects of the instant cases, and then to summarize what appear to us the critical features of that decision.

The Detroit ordinance prohibited "more than two [regulated] uses within one thousand feet of each other," *id.* at 54 n.6, 96 S.Ct. at 2444 n.6, and defined regulated uses as adult bookstores, adult motion picture theaters, adult mini motion picture theaters, cabarets with nude or partially-nude entertainment, and also dance halls, bars, pool halls, public lodging facilities, second-hand stores, pawnshops, and shoeshine parlors, *id.* at 52 n.3, 96 S.Ct. 2440. The ordinance defined adult bookstores, adult theaters, and adult mini-theaters as those "distinguished or characterized by an emphasis on matter depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,'" *id.* at 53–54 n.5, 96 S.Ct. at 2444 n.5, and defined those sexually-explicit activities or areas in terms virtually identical to the North Carolina statute, *id.* at 53 n.4, 96 S.Ct. 2440.

In addition to their similar terms and definitions, both the Detroit and North Carolina laws essentially regulate in similar fashion the place and manner of "adult

establishment" operations. The fundamental effect sought by both is geographic dispersal of these operations, in an obvious attempt to reduce adverse external effects perceived to result from a concentration of "adult" activities. They differ only in the methods chosen to force dispersal: Detroit permits adult bookstores, theaters, and mini-theaters to operate only if they are at least 1,000 feet from any other adult establishments and other regulated uses, while North Carolina permits such adult bookstores, theaters, and mini-theaters to operate only if they are in a different building and on different premises from any one such adult establishment and other regulated uses (*i. e.*, massage parlors or sexual device vendors).

Two other differences must be noted. The Detroit ordinance was an amendment to an existing "Anti-Skid Row Ordinance," adding adult establishments to a group of previously regulated uses. The Detroit ordinance did not affect existing establishments but only the location of new ones, while the North Carolina statute affects existing as well as future adult establishments, but allowed a six month grace period between the statute's passage and its effective date. While we do not consider these critically distinguishing, they deserve and are given specific attention in subsequent discussion.

The majority opinion in *Mini-Theatres* rejected arguments that the Detroit ordinance violated the First Amendment through prior restraint or vagueness, 427

U.S. at 58–63, 96 S.Ct. 2440, and then in a four-member plurality opinion, with the concurrence of a fifth justice in the result, rejected arguments that the law violated the First Amendment or equal protection as a classification on the basis of content and a disparate treatment of the resulting classes, *id.* at 63–73, 96 S.Ct. 2440 (plurality opinion of Stevens, J.); *id.* at 75–76, 96 S.Ct. 2440 (Powell, J., concurring). The plurality opinion was apparently premised on the four Justices' finding of a "lesser" First Amendment protection for erotic material, which permits reasonable regulation of such material in furtherance of a legitimate government interest.[2] Justice Powell did not reach this issue in his concurring opinion, but indicated that he was not inclined to agree with the plurality's approach,[3] while the four dissenting justices emphatically rejected any notion of a diminished First Amendment protection for erotic materials. *Id.* at 96, 96 S.Ct. 2440.

While simply as a matter of *stare decisis* we consider the holding in *Mini-Theatres* dispositive of the central issues in these appeals whether the rationale be that of the plurality or of Justice Powell concurring, we prefer to rest our holding on the reasoning employed by Justice Powell. With him, we think that regardless of the level of First Amendment protection to which sexually-explicit publications and films (erotic materials) are entitled, a sufficient justification for any incidental burden produced by the location regulation involved here is provided by an important and substantial state interest under the test in *United*

---

**2.** [E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate that inspired Voltaire's immortal comment. Whether political oratory or philosophical discussion moves us to applaud or to despise what is said, every schoolchild can understand why our duty to defend the right to speak remains the same.

But few of us would march our sons and daughters off to war to preserve the citizen's right to see "Specified Sexual Activities" exhibited in the theaters of our choice. 427 U.S. at 70, 96 S.Ct. at 2452.

**3.** "I do not think we need reach, nor am I inclined to agree with, the holding in Part III (and supporting discussion) that nonobscene, erotic materials may be treated differently under First Amendment principles from other forms of protected expression." *Id.* at 73 n.1, 96 S.Ct. 2440.

*States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). That test sustains a regulation primarily of conduct or noncommunicative aspects of protected materials that imposes an incidental burden on expression "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on . . . First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679. In *Mini-Theatres* Justice Powell found that (1) regulation of the location of adult establishments, as of any other businesses, was within the police power, 427 U.S. at 75, 80, 96 S.Ct. 2440; (2) such regulation furthered important and substantial state interests in preventing neighborhood deterioration and crime, *id.* at 80, 96 S.Ct. 2440; (3) these interests were directed at secondary effects of concentrated adult establishments and not at suppression of speech, *id.* at 74–75, 96 S.Ct. 2440; and (4) the incidental burden, if any, was no greater than essential because the ordinance was directed only at adult establishments and not at other bookstores and theaters lacking those secondary effects, *id.* at 82, 96 S.Ct. 2440.

We believe that the North Carolina statute also satisfies the *O'Brien* test. We will first examine the effect of the statute on First Amendment-protected expression, and then consider that effect in light of the other elements of the *O'Brien* test. In Part III we consider whether the statute impermissibly classifies expression according to its content and treats the resulting classes unequally, in violation of equal protection. The contention that the statute is unconstitutionally vague is discussed in Part IV; and in Part V we consider the claim that it violates the right to privacy.

## II

We find the North Carolina statute to be merely a regulation of the place and manner of expression, without proscription of that expression, of the type not forbidden by the First Amendment. See *California v. LaRue*, 409 U.S. 109, 117 n.4, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Cox v. New Hampshire*, 312 U.S. 569, 576, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The essential regulation is of location. The statute prohibits dissemination of sexually-explicit materials in places where a building or premises is occupied by more than one adult bookstore, adult theater, adult mini-theater, massage parlor, or sexual device vendor. This essentially exhausts the force of the regulation. Dissemination of the affected materials in the myriad of other available locations is not restricted. As both the plurality and concurring opinions in *Mini-Theatres* agreed in considering the analogous ordinance before that Court: ". . . what is ultimately at stake is nothing more than a limitation on the place where adult films may be exhibited," *id.* 427 U.S. at 71, 96 S.Ct. at 2453 (plurality opinion), because the "ordinance is addressed only to the places at which this type of expression may be presented," *id.* at 78–79, 96 S.Ct. at 2456 (Powell, J., concurring). *Accord, Northend Cinema, Inc. v. City of Seattle*, 90 Wash.2d 709, 585 P.2d 1153, 1158 (1978) (en banc). If it can be thought that there is any further aspect of the regulation, it relates simply to the manner in which the materials may be disseminated. The North Carolina statute, like the Detroit ordinance, is aimed at prohibiting a "supermarket" marketing technique that offers for sale or exhibition at one business location a variety of sexual wares in addition to printed materials. Comparable regulation of specific techniques and methods of commerce in erotic materials has not been thought violative of First Amendment values.[4]

4. *See Dover News, Inc. v. City of Dover*, 381 A.2d 752, 755–56 (N.H.1977) (prohibiting offensive storefront displays); *Borrago v. City of Louisville*, 456 F.Supp. 30, 32 (W.D.Ky.1978)

So long as protected materials continue to be fully available and public access to them is not substantially impaired, place and manner regulations of this type do not offend the First Amendment. 427 U.S. at 76–78, 96 S.Ct. 2440. (Powell, J., concurring). The North Carolina statute, like the ordinance in *Mini-Theatres,* does not limit the total number of adult establishments or restrict them to any one area; nor does it ban any type of sexually-explicit material. While one district court below found that "a reduction of availability *may* well occur," *U. T. Inc. v. Edmisten,* Nos. 77–365 and 77–366, slip op. at 3, (W.D.N.C. July 24, 1978) (emphasis added), that court did not find a great probability of such reduction, and the other actually speculated that the statute "logically leads to a proliferation of adult-oriented businesses as existing establishments open branch stores to comply," *Hart Book Stores v. Edmisten,* 450 F.Supp. 904, 907 (E.D.N.C.1978). In fact, it is too early to be certain of the long-range effect of the law on availability of these materials to the public. On the record before us, it can only be noted that thus far the adult establishments involved have all apparently opted for compliance rather than closing, so that overall availability of the materials would seem little affected.

The Detroit ordinance upheld in *Mini-Theatres* actually imposed a greater restraint in many respects than does the North Carolina statute: Detroit forced dispersal by a 1,000 foot distance rather than simply to adjacent buildings or neighboring premises. Further, it excluded adult establishments from any area already occupied by any two hotels, motels, bars, cabarets, dance halls, pawnshops, poolhalls, or shoeshine parlors, while North Carolina does not. Finally, the *Mini-Theatres* ordinance defined adult bookstores and theaters as those with a "substantial or significant portion" of their materials featuring sexual explicitness, while the North Carolina statute restricts its definition to bookstores and theaters with a "preponderance" of sexually explicit materials. *Compare Young v. American Mini-Theatres, Inc.,* 427 U.S. at 52 n.3, 53–54 n.5, 96 S.Ct. 2440 *with* note 1 *supra.*[5]

Both district courts thought it of critical significance that the statute imposed a significant economic burden on the sale or exhibition of erotic materials. *See U. T. Inc. v. Edmisten,* slip op. at 2; *Hart Book Store, Inc. v. Edmisten,* 450 F.Supp. at 906. While it is obvious that the First Amendment sets limits on the economic burdens that can be imposed upon the dissemination of protected materials, we simply do not find those exceeded by the relocation burden involved here. Zoning and other regulations for the public welfare frequently are an economic detriment to affected businesses; the fact that these carry materials protected by the First Amendment does not exempt them from the consequences of an otherwise valid regulation. Again we find *Mini-Theatres* dispositive:

> The constraints of the ordinance with respect to location may indeed create economic loss for some who are engaged in this business. But in this respect they

---

(same). *Cf. Developments in the Law—Zoning,* 91 Harv.L.Rev. 1427, 1562–63 & n.81 (1978) (hours and design regulation of adult establishments would not violate First Amendment).

**5.** In addition to *Mini-Theatres,* other cases have held that analogous regulations do not substantially restrict access to sexually-explicit materials or the availability of such wares. *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d 1153, 1157 (1978) (en banc) ("[T]here is no evidence that the effect of this ordinance

will be a substantial deterrence to protected First Amendment speech. It does not limit the total number of adult theaters which may operate in the City, or significantly inhibit viewers from gaining access to the films."); *see Borrago v. City of Louisville,* 456 F.Supp. 30, 32 (W.D.Ky.1978); Note, *Using Constitutional Zoning to Neutralize Adult Entertainment—Detroit to New York,* 5 Fordham Urban L.J. 455, 473–74 (1977) (New York regulation "does not restrict or prohibit the content availability of adult entertainment").

are affected no differently from any other commercial enterprise that suffers economic detriment as a result of land-use regulation. The cases are legion that sustained zoning against claims of serious economic damage. . . .

The inquiry for First Amendment purposes is not concerned with economic impact; rather, it looks only to the effect of this ordinance upon freedom of expression.

427 U.S. at 78, 96 S.Ct. at 2456 (Powell, J., concurring).[6]

Because we conclude that the challenged statute is directed primarily at the noncommunicative aspects of protected expression, with only an incidental effect on expression itself,[7] further analysis under the test in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) is appropriate. The first question is whether the regulation lies generally within the constitutional powers of the state. On this there can be no doubt that this statute, like the regulation in *Mini-Theatres*, is "certainly within the concept of the public welfare that defines the limits of the police power."

427 U.S. at 75, 96 S.Ct. at 2454 (Powell, J., concurring). Whether or not the statute is a true zoning law,[8] it is a legitimate exercise of the police power, under which the state may limit the use of private property for the public welfare. *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

The next question is whether the regulation furthers an important or substantial interest. We conclude that it does. North Carolina certainly has a substantial interest in maintaining a stable, healthful environment in its cities. The legislature could reasonably have determined that the development of the "total, under one roof" approach to the marketing of sexually explicit materials and devices tended to produce secondary effects destructive of the general quality of life in the neighborhood. While there is no formal legislative history of the law, the record does show that the sponsor of the legislation was concerned to bring these secondary effects to the legislature's attention.[9] A legislative determination

---

**6.** *See also Borrago v. City of Louisville*, 456 F.Supp. 30, 31 (W.D.Ky.1978) ($250 annual license fee and expensive requirement of door attendant to exclude minors); *Airport Book Store, Inc. v. Jackson*, 242 Ga. 214, 248 S.E.2d 623, 625, 629 (1978) ($500 licensing investigation fee and employment disqualification for convicted felons); *Northend Cinema, Inc. v. City of Seattle*, 90 Wash.2d 709, 585 P.2d 1153, 1160 (1978) (en banc) (location restriction similar to *Mini-Theatres*) (the "objection, that simply having to move to another location or show a different type of film is substantial economic harm, is unsupported").

**7.** We reach the same conclusion, via the same analysis, whether the statute is challenged as a prior restraint, a subsequent restraint, or as an unconstitutional condition, *see U. T. Inc. v. Edmisten*, slip op. at 4.

**8.** Appellees contend, and both district courts below found, that the challenged statute is not a zoning law, *U. T. Inc. v. Edmisten*, slip op. at 3; *Hart Book Stores, Inc. v. Edmisten*, 450 F.Supp. at 906–07. While we do not consider this point crucial to our analysis, we would note that many zoning enactments prohibit the mingling of particular uses in a single building just as the North Carolina statute bars the combination of adult uses in a single building.

The Supreme Court sustained under the zoning power an ordinance prohibiting the residential use of a single dwelling by unrelated individuals in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and upheld a regulation proscribing the combined use of a single commercial building for sexually-explicit entertainment and liquor serving in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972). Many laws prohibit the combination of a residential and a commercial use of a dwelling; *see, e. g., Jamison v. Kyles*, 271 N.C. 722, 157 S.E.2d 550 (1967); *City of Florence v. Turbeville*, 239 S.C. 126, 121 S.E.2d 437 (1961).

Of course it is irrelevant that the challenged exercise of the police power is by a state rather than a municipality, even if it be thought important to qualify the state statute as a "zoning" law of the kind considered in *Mini-Theatres*. Both the general police power, and that aspect of it realized in "zoning" regulations, are reposed originally in the state. *State v. Joyner*, 286 N.C. 366, 369, 211 S.E.2d 320, 322 (1975); *Allgood v. Town of Tarboro*, 281 N.C. 430, 437, 189 S.E.2d 255, 260 (1972).

**9.** The sponsoring senator read to a legislative committee considering the bill a report from the Director of a County Health Department on

that the dispersal of the marketing activities might ameliorate these secondary effects to some extent, thereby furthering the state's interest, cannot be thought unreasonable. *See Airport Book Store, Inc. v. Jackson*, 242 Ga. 214, 248 S.E.2d 623, 628–29 (1978).[10]

Closely entwined is the next element of the *O'Brien* test: whether the state's interest is one unrelated to the suppression of free expression. One district court ruled that the statute failed this requirement of the *O'Brien* test. That court concluded that "the inescapable inference is that economic harm to plaintiffs' businesses was the primary legislative motive." 450 F.Supp. at 907. We believe that this conclusion misinterprets the *O'Brien* test. The relevant question under *O'Brien* is not whether the perceived "legislative motive" for legislation is unrelated to the suppression of free expression, but whether an identifiable "governmental interest" is so unrelated. Indeed the *O'Brien* Court specifically disavowed any consideration of the legislative motive: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. at 383, 88 S.Ct. at 1682. As the Court there observed, in conducting this inquiry, it is best to eschew altogether the "guesswork" of speculating about the motive of lawmakers, for the obvious reasons that many legislators may have different purposes in legislation than the few who are moved to comment on it. *Id.* at 384, 88 S.Ct. 1673.[11] Courts must look in the final analysis to the legislation itself. On its face the challenged statute is a permissible regulation of

the results of an inspection of several affected establishments in Wake County:

> They visited five such establishments. At each they saw the usual array of pornographic publications. They found also cubicles or small booths where patrons enter, deposit a quarter and view assorted salacious films. Certain of the male customers masturbate under the resulting stimulation, ejaculating upon the floor and walls. The volume of semen was so considerable by mid-afternoon as to be trickling down the wall to the floor.
>
> . . .
>
> Each of the five places checked had such cubicles and film projecting equipment. These numbered from twelve to sixteen.
>
> Though only male customers were seen on this occasion, females are also afforded similar attention. Dildos of every description were available for sale, for use on the premises or for removal therefrom.
>
> Used condoms littered the floors. The use therefor can only be speculated upon.
>
> When questioned about the mess, the operators generally observed that it didn't do much good to clean up; 'Twas soon all to do over again' . . . .

10. Other decisions have found similar location restrictions for adult establishments justified as zoning to serve the legitimate interests in preserving residential neighborhoods and preventing urban decay. *Nortown Theatre Inc. v. Gribbs*, 373 F.Supp. 363, 369 (E.D.Mich.1974), *rev'd sub nom. American Mini Theatres, Inc. v. Gribbs*, 518 F.2d 1014 (6th Cir. 1975), *rev'd sub nom. Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (location for regulation necessary for "preservation of neighborhoods"); *Northend*

*Cinema, Inc. v. City of Seattle*, 90 Wash.2d 709, 585 P.2d 1153, 1156 (1978) (en banc) (sustaining lower court "finding that the location of adult theaters has a harmful effect on the area and contribute[s] to neighborhood blight"); *see Young v. American Mini Theatres, Inc.*, 427 U.S. at 55, 96 S.Ct. 2440 (expert testimony that nearby concentration "encourages residents . . . to move elsewhere"); Los Angeles Dept. of City Planning, *Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles* 5 (City Plan Case No. 26475, City Council File No. 74–4521–S.3, 1977) (hereinafter cited as *Effects of the Concentration of Adult Establishments*) ("Businessmen, residents, etc. believe that the concentration of adult establishments has adverse effects on . . . the quality of life . . . . Among the adverse effects on the quality of life cited are increased crime; the effects on children; neighborhood appearance, litter and graffiti.").

11. Typical of the dead-end into which such judicial inquiries are likely to lead is the conflicting evidence about the personal motive of the House sponsor of this legislation. His own affidavit stated that he introduced this bill in hope that "the immoral atmosphere and unsanitary conditions described in the health inspector's letter would be less likely to occur." (App. 81). Two newspaper reporters who covered the bill's passage stated in affidavits that the legislator had told them he sponsored the bill because it would cut the profits of adult businesses and probably would drive them out of business. (Jt.App. 82, 84).

the external costs of adult establishments that is unrelated to the overall suppression of any protected materials offered by them for public consumption.[12]

Finally we conclude under the *O'Brien* test that the incidental restriction on First Amendment interests is no greater than is essential to furtherance of the state's interest. The means chosen by North Carolina in its effort to eliminate the undesired secondary effects of adult establishments appears to be one of the least burdensome means the state could have chosen; indeed it may prove to be totally ineffectual, or as one district court actually predicted, "have a minimal effect on degenerate conduct." 450 F.Supp. at 907. The statute does not go as far in some respects as did the Detroit ordinance. It does not require dispersal of adult activities to a distance of 1,000 feet, but only to an adjacent building. Additionally, the statute is limited in its effect to adult bookstores and theaters, which are the only ones perceived to engender unhealthful conditions. Had the statute included all bookstores and theaters, or all commercial establishments, it might well have been far more restrictive than necessary. *See* 427 U.S. at 82, 96 S.Ct. 2440.

Plaintiffs charge that the statute is too burdensome because it does not exempt existing establishments as did the *Mini-Theatres* ordinance. It does, however, provide for a six month period before its effective date, 1977 N.C.Sess.Laws ch. 987, § 2. Under well-established principles, this is a sufficient amortization period in view of the termination then of only some and not all erotic material sales in the building or premises. Many valid zoning laws apply immediately to existing uses, e. g., *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and most take

effect after an amortization period against existing establishments, e. g., *State v. Joyner*, 286 N.C. 366, 375, 211 S.E.2d 320, 325 (1975); *see also Art Neon Co. v. City and County of Denver*, 488 F.2d 118, 122 (10th Cir. 1973); *Northend Cinema, Inc. v. City of Seattle*, 90 Wash.2d 709, 585 P.2d at 1160 (sustaining three month amortization period for adult theater that permitted non-adult theater use thereafter); *City of Los Angeles v. Gage*, 127 Cal.App.2d 442, 461, 274 P.2d 34, 44–45 (1954) (sustaining termination of commercial use that permitted profitable residential use); Note, *Using Constitutional Zoning to Neutralize Adult Entertainment—Detroit to New York*, 5 Fordham Urb.L.J. 455, 472–74 (1977) (defending one year amortization period).

Though the particular method chosen by North Carolina may not prove to be effective in eliminating the undesirable spin-off conditions, we cannot say that legislative action is rendered irrational by its choice of a less efficacious and less powerful approach than the Constitution might permit.

### III

The district courts below both found that, in addition to the statute's impact on freedom of expression, it impermissibly discriminated between types of bookstores and theaters solely on the basis of the content of their wares. 450 F.Supp. at 904, 908; slip op. at 4. We reject these determinations and find no equal protection violation.

The unequal treatment of commercial establishments involved here is based most essentially on the different effects they are considered to have on their surroundings. *See Young v. American Mini-Theatres*, 427 U.S. 50, 82 n.6, 96 S.Ct. 2440, 49 L.Ed.2d 310. Moreover, we believe that a classification by content may be permissible in circumstances such as those involved here where the state has acted to protect other,

---

12. We realize that the histories of this statute and of the *Mini-Theatres* ordinance differ in that the latter was an amendment to an ordinance that had applied the same restrictions to other regulated uses for ten years prior to the addition of adult establishments to the list. 427 U.S. at 54, 96 S.Ct. 2440. We do not,

however, find this difference significant; the amendment itself was directed only at adult establishments and could have had the purpose of harming those establishments, but the Court found this not controlling. *Id.* at 80–81, 96 S.Ct. 2440 (Powell, J., concurring).

overriding interests. *See, e. g., FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (plurality opinion) (upholding ban on nonobscene but "filthy" words on afternoon radio broadcast); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (upholding a prohibition on political, but not commercial, advertising on public transit vehicles); *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (upholding proscription of nonobscene erotic dancing or movies in places where liquor was served).

Our conclusion that the statute does not violate equal protection is rested essentially on the same rationale as that which led us to conclude that no First Amendment violation is shown. Because the statute has only an incidental effect on protected expression, First Amendment interests are not directly threatened by the unequal treatment of adult and non-adult establishments, and consequently the classification may be justified if it is rationally related to an important state interest.[13] We will not repeat our previous discussion of the merely incidental effect on expression and of the state's interest that is furthered by this regulation, but we do give additional consideration in this context to the challenged classification and to its rational relationship to the implicated state interest.

The North Carolina law regulates adult establishments differently from other bookstores and theaters because of the unique external costs of adult enterprises. As Justice Powell wrote in *Mini-Theatres*, "the urban deterioration was threatened, not by the concentration of *all* movie theaters with other 'regulated uses,' but only by a concentration of those that elected to specialize in adult movies" and publications. 427 U.S. at 82, 96 S.Ct. at 2458. Such a classification and regulation of different classes on the basis of their different external costs or obtrusive characteristics has been upheld for other classifications touching on speech and press activities such as those involving picketing. *See, e. g., Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (picketing or parading but not speech prohibited), *DeGregory v. Giesing*, 427 F.Supp. 910, 915 (D.Conn.1977) (3-judge court) (only labor picketing prohibited). *Cf. Taylor v. City of Chesapeake*, 312 F.Supp. 713 (E.D. Va.1970) (live performances but not speeches and other expression prohibited). Special regulation of one commercial enterprise with particular externalities but not of other enterprises lacking those secondary effects has long been recognized not to violate equal protection, *e. g., Hadacheck v. Sebastian*, 239 U.S. 394, 412–14, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (brickmaking); *Rosenthal v. People*, 226 U.S. 260, 270–71, 33 S.Ct. 27, 57 L.Ed. 212 (1912) (junkyards), precisely because the enterprises are not similarly situated and the different treatment is warranted by the different secondary effects.

---

**13.** While a classification and unequal regulation involving a suspect class or directly burdening fundamental rights such as fully-protected First Amendment interests can only be justified if it serves a compelling state interest by the least burdensome means, *Dunn v. Blumstein*, 405 U.S. 330, 337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), such a classification and regulation involving other classes of constitutional rights need only serve a legitimate state interest by rationally related means, *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *McDonald v. Board of Election Commissioners*, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). And a classification created by a zoning law is subject to this minimal scrutiny standard, *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *see Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed.2d 303 (1926), as is a classification made by other police power regulation, *McGowan v. Maryland*, 366 U.S. 420, 425–27, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *see Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion). The *Mini-Theatres* plurality apparently considered that classification of sexually explicit materials would invoke only minimal scrutiny, 427 U.S. at 70–73, 96 S.Ct. 2440. Justice Powell in effect applied the same level of scrutiny in his analysis, but did so not because he considered that erotic materials deserved less protection, but because they were not actually suppressed by the zoning ordinance. *Id.* at 78–80, 96 S.Ct. 2440.

Plaintiffs rely upon *Police Department of Chicago v. Mosely,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), in which the court invalidated on equal protection grounds an ordinance prohibiting all picketing near schools except labor dispute picketing, for their contention that classifications by content of speech are never permissible. Brief of Appellees at 26, 27. This broad principle, however, has been qualified many times; *see, e. g., Greer v. Spock,* 424 U.S. 828, 831, 838–39, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976); *Rowan v. United States Post Office Department,* 397 U.S. 728, 735–38, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970); *Cox v. Louisiana,* 379 U.S. 559, 563–64, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). Moreover, *Mosely* involved unequal treatment of speech occurring in a public forum, where speakers are necessarily similarly situated and no governmental interest justified the unequal treatment; it was based solely on the content of the speech.

The classification bears a rational relationship to the state interest earlier identified. One of the district courts did not agree on this critical point because "[a]t best, the means chosen . . . would have a minimal effect on degenerate conduct" and at worst it would cause "a proliferation of adult-oriented businesses." *Hart Book Stores, Inc. v. Edmisten,* 450 F.Supp. at 907. But a legislative approach need simply be rationally related to the state objective when enacted, and need not have proved efficacious from the retrospective vantage point of a reviewing court. For example, in *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), a zoning limitation on multiple family habitation in a single dwelling that was not proved effective in relieving urban congestion and noise and advancing family values and clean air, was yet found rationally related to those state interests, *id.* at 8, 94 S.Ct. 1536.

In concluding that the rational relation between state interest and means of regulation required to support the classification was not present the district courts were also apparently greatly influenced by the dearth of hard evidence before the legislature that the interest was indeed threatened or that the means chosen to protect it would work. In this, we think they insisted on a showing that need not be made in order to uphold legislative efforts to deal with a problem within reach of the police power. In *Mini-Theatres* itself, the fact that the legislative body had before it the testimony of a single expert concerning the effect of adult businesses on neighborhoods, *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. at 365, was not thought to draw in question the rationality of the legislative decision to attempt regulation in the particular way chosen. As the Supreme Court pointed out in *Paris Adult Theatre I v. Slayton,* 413 U.S. 49, 61, 93 S.Ct. 2628, 2637–2638, 37 L.Ed.2d 446 (1973): "From the beginning of civilized societies, legislators and judges have acted on various unprovable assumptions," and "[n]othing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data." Furthermore, in judicial assessments of the rationality of legislative means chosen to advance state interests, government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Mini-Theatres,* 427 U.S. at 71, 96 S.Ct. at 2453. The very disparity of legislative approaches in various jurisdictions to regulating the kind of commercial enterprise involved here and the lack of a long record of regulatory efforts underscores the need for a chance for reasonable experimentation. *See* F. Strom, *Zoning Control of Sex Businesses* 53, 57, 62, 65, 71 (Boston: concentration of adult establishments; Chicago: dispersal; Dallas: dispersal; Oakland: dispersal; Indianapolis: special exception); *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d 1153 (1978) (Seattle: concentration).

Finding no violation of equal protection rights, we decline to invalidate North Carolina's effort to cope with a problem of commercial regulation under its police power simply because it treats those establishments that are perceived to have undesir-

able external effects differently from those that do not.

## IV

■ Next we consider appellee's contention that the statute is unconstitutionally vague. We reject this claim at the outset because it is apparent that under *Young v. American Mini-Theatres,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310, appellees lack standing to raise it. The statute's terms clearly apply to appellees, all of whom stock at least a preponderance of sexually-oriented materials in their establishments. The fact that they have had to change their method of operation since the statute's effective date, *see* Brief of Appellees at 50, only confirms their understanding of the statute's effect and does not aid them in their vagueness claim.

In *Mini-Theatres,* a majority of the Supreme Court (Justice Powell joined in this portion of the opinion) held that, because the ordinance there clearly applied to them, the respondent adult theaters did not have standing to challenge the ordinance for vagueness. The majority agreed that the usual concerns that permit litigants who are not affected by vagueness in a law touching expression to raise the claim on behalf of others possibly affected are not present when sexually-explicit materials are at issue:

> Since there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between pornography and artistic expression than in the free dissemination of ideas of social and political significance, and since the limited amount of uncertainty in the ordinances is easily susceptible of a narrowing construction, we think this is an inappropriate case in which to adjudicate the hypothetical claims of persons not before the Court.

*Id.* 427 U.S. at 61, 96 S.Ct. at 2448.[14] *Accord, FCC v. Pacifica Foundation,* 438 U.S. 726, 743, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). We find, on the record before us, that appellee adult establishments clearly come within the statutory terms and so lack standing to challenge them for vagueness.

■ Furthermore, we believe that even were appellees granted standing to raise this issue, the statute would withstand a vagueness challenge. One district court below found vagueness in the North Carolina statute's reference to publications or films distinguished by their "emphasis" on sexual explicitness and to multiple adult establishments in a single "building, premises, structure or other facility." *U. T. Inc. v. Edmisten,* slip op. at 5. Plaintiffs also allege vagueness in the definition of "adult bookstores," "adult . . . theaters," and "adult . . . mini theaters"; the reference to a "preponderance" of the books or films in such establishments; the reference to material "depicting, describing or relating to" sexual explicitness; and the use of "distinguished or characterized by their emphasis" on erotic content. Brief of Appellees at 47, 49. We consider these statutory definitions reasonably specific and precise, bearing in mind that unavoidable imprecision is not fatal and celestial precision is not necessary, *Miller v. California,* 413 U.S. 15, 27–28 n. 10, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Roth v. United States,* 354 U.S. 476, 491–92, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). The phrase "distinguished or characterized by an emphasis" on sexual explicitness, used in the *Mini-Theatres* ordinance, has been sustained in *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. 363, 367 (E.D.Mich. 1974), *rev'd sub nom. American Mini-Theatres, Inc. v. Gribbs,* 518 F.2d 1014 (6th Cir. 1975), *rev'd sub nom. Young v. American Mini-Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976); *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d 1153, 1157 (1978) (en banc). The terms "depicting, describing or relating to" specified sexual activities and areas, also used in the *Mini-Theatres* enactment, has been upheld over vagueness challenges in

---

14. For the same reasons, the Court declined to apply the First Amendment doctrine of overbreadth, *id.* at 59–60 & n. 17, 96 S.Ct. 2440.

*Miller v. California,* 413 U.S. at 24, 93 S.Ct. 2607; *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. at 367; *Northend Cinema, Inc. v. City of Seattle,* 90 Wash.2d 709, 585 P.2d at 1157. The reference to the "predominant" character of publications or films has been sustained in *Ward v. Illinois,* 431 U.S. 767, 770–73, 97 S.Ct. 2085, 52 L.Ed.2d 738 (1977); is like the "dominant theme" test in *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); and is certainly less vague than the "substantial or significant portion" phrase, used in the *Mini-Theatres* ordinance, and upheld in *Nortown Theatre Inc. v. Gribbs,* 373 F.Supp. at 367; *Airport Book Store, Inc. v. Jackson,* 242 Ga. 214, 248 S.E.2d at 625 n. 1, 626 n. 3, 629. The definitions of "adult bookstores," "adult . . . theaters," and "adult . . . mini theaters" are not vague because their component elements are not. Finally, the meaning of building, premises, structure or other facility" is reasonably definite. Any ambiguity in the meanings of these terms as applied is, as the Supreme Court majority held in *Mini-Theatres,* " 'readily subject to a narrowing construction by the state courts.' " 427 U.S. at 61, 96 S.Ct. at 2448; *see, e. g., Ward v. Illinois,* 431 U.S. at 773–76, 97 S.Ct. 2085; *Ginsberg v. New York,* 390 U.S. 629, 643, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

Additionally, because this adult establishment law carries a criminal penalty, we are confident that the state courts will construe it to require scienter for its violation by adult establishment proprietors, in the sense of knowledge or reasonable awareness of the sexually-explicit content of a store's predominant wares and of the existence of other adult material or sexual device sales in the same building or premises. *See Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Grove Press, Inc. v. Flask,* 326 F.Supp. 574, 578 (N.D.Ohio 1970), *vacated on other grounds,* 413 U.S. 902, 93 S.Ct. 3026, 37 L.Ed.2d 1013 (1973).

## V

Finally, we consider Appellees' contention that the North Carolina statute violates the constitutionally protected right of privacy.

The statute prohibits the sale of "sexually oriented devices" in the same building or premises as adult bookstores, theaters, mini-theaters, or massage parlors. We assume for purposes of this discussion that the term "sexually oriented devices" would apply to contraceptives, although we recognize the possibility of a state court construction of the term to exclude contraceptive devices.

One district court below concluded that the North Carolina statute "violates the right of privacy since it seeks to ban the sale of prophylactic devices in places where primarily sexually oriented books are sold," citing *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *U. T. Inc. v. Edmisten,* Nos. 77–365 and 77–366, slip op. at 5 (W.D. N.C. July 24, 1978). But *Carey v. Population Services International* involved a law placing a substantial burden on access to nonmedical contraceptives because it prohibited *anyone* except licensed pharmacists from selling them, 431 U.S. at 686, 689, 97 S.Ct. 2010. The statute challenged here, on the other hand, does not burden access to contraceptive devices, because it restricts their sale in only one place (*i. e.,* buildings containing adult establishments) rather than prohibiting their sale in any place but one (*i. e.,* licensed pharmacies) and this does not significantly restrict access to contraceptives in all the other places where they are more commonly sold. We see no reason why North Carolina cannot prohibit the sale of contraceptives along with other sexual devices in adult establishments, because the resulting restriction upon general access to them cannot sensibly be thought significant.

## VI

In practical terms this statute may well be revealed as yet another essential failure in the ancient, essentially unequal struggle to contain various social side-effects of the commercial exploitation of human sexuality. An omniscience that could plumb the depths of the many strands of motivation

behind this particular effort would undoubtedly reveal much of questionable social and philosophical insight as to both ends and means. Our concern is not, however, with questions of the practical ineptitude of legislation nor even with the possibility of its sheer silliness or asininity in a social or philosophical sense, *see Griswold v. Connecticut,* 381 U.S. 479, 527, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (dissenting opinion), but with whether it violates specific rights secured by the Constitution.

Finding no violation of the constitutional rights invoked here, we reverse the judgments of the district courts.

*REVERSED.*